UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **MEMORANDUM OPINION & ORDER** |
| - against - | |
| ARMANDO JOSE JARQUIN RICO, | (S1) 18 Cr. 661 (PGG) |
| Defendant. | |

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Armando Jose Jarquin Rico is charged with conspiracy to distribute

and possess with intent to distribute a kilogram and more of heroin, in violation of 21 U.S.C. §§

841(a)(1), 841(b)(1)(A), and 846. ((S1) Indictment (Dkt. No. 34)) Rico has moved to suppress

physical evidence seized inside his apartment – including thirteen kilograms of heroin – as well

as his post-arrest statements. (Mot. (Dkt. No. 20))[1] For the reasons stated below, Rico's motion

will be granted in part and denied in part.

## BACKGROUND

### I. RICO'S DECLARATION

In support of his motion to suppress, Rico submitted a declaration (see Rico Decl.

(Dkt. No. 23)) alleging the following:

In September 2018, Rico lived in "a studio apartment on the ground floor of a

house." Rico's landlords occupied the second and third floors of the house, which is located at

2239 Bruckner Boulevard in the Bronx. (Id. ¶¶ 3, 4; Rico Decl., Ex. A (photograph) (Dkt. No.

23-1))

---

[1] The page numbers of documents referenced in this opinion correspond to the page numbers
designated by this District's Electronic Case Filing system.

A chain-link fence with two gates borders the house. (Id. ¶ 4; Ex. A) When facing 2239 Bruckner Boulevard, the gate on the left opens to a concrete walkway that leads to a stairway to the main entrance on the second floor. (Id.) The gate on the right side of the fence "opens into a driveway that leads to a garage." (Id.) To the left of the garage is an entrance leading to the ground floor of the house. (Id.; see also DX A) The ground floor entrance contains two doors. "The outer door is a glass door with iron bars, which opens outwards into the driveway. The inner door is a solid door with no windows, which opens inwards into the house." (Rico Decl. (Dkt. No. 23) ¶ 5) The inner door leads to a hallway. Off the hallway is a door to Rico's ground floor apartment. The hallway also contains "an internal staircase that leads upstairs to where [Rico's] landlords live." (Id.)

On September 7, 2018, at about 3:00 to 4:00 p.m., Rico was inside his ground floor apartment rehearsing with other members of his mariachi band. Rico and his two colleagues were scheduled to perform that evening. (Id. ¶ 6) The doorbell for Rico's apartment rang, and Rico went to the ground floor entrance to answer the door. (Id.) A deliveryman "had two packages that he said were for 'Armando.'" Rico accepted the packages and brought them inside, closing both doors to the ground floor entrance. (Id.) He then returned to his apartment with the packages. (Id. ¶ 7)

Less than a minute later, Rico's doorbell rang again. Rico went to the ground floor entrance and opened the inner door. (Id.) Rico saw that the outer glass door was already open, and he observed "more than ten people pointing their guns at [him]." (Id.) Rico became "paralyzed with fear, unable to think, to speak, or to move." (Id.) "An agent reached into where [Rico] was [standing], grabbed [his] wrist and pulled [him] out of the building and into the driveway." The agent "slammed [Rico] to the ground, and handcuffed [him,] while one of the

2

[other] men pressed his knee against [Rico's] face." (Id.) The two other members of Rico's mariachi band were also detained. (Id.)

The agents then "demanded [Rico's] identification." After Rico told the agents that his identification was inside his apartment, they "dragged [Rico] back inside [his] apartment" and asked him "where it was." (Id. ¶ 8) After the agents located Rico's identification, "they sat [Rico] down on the couch with [his] hands still cuffed," and "demanded that [he] tell them where [his] drugs and weapons were." Rico – who was "intimidated by the many, many agents surrounding [him] in [his] tiny apartment" – told the agents that he had no drugs or weapons. (Id.)

The agents then "shoved two forms in [Rico's] face and told [him] to sign them." Rico "tried to read the forms but could not," as he was "too terrified to read past the first few words," and "could not focus." (Id. ¶ 9) The agents told Rico that "the two forms were for the searches of [his] apartment and [his] electronic devices and that [he] had to sign them." (Id.) The agents uncuffed Rico's hands and Rico signed the forms. Rico was then re-cuffed and taken out of his apartment into the hallway. Other agents "continued to search [his] apartment." (Id.)

In the hallway, "the agents searched through [Rico's] cellphone." As they were doing so, the phone "received a text message from [Rico's] roommate, Jimmy." Rico told the agents that "the message was from the owner of the packages that were just delivered." (Id. ¶ 10) "The agents instructed [Rico] to call Jimmy and ask him to come to [their] apartment." Putting his phone on speaker, Rico dialed Jimmy's number. (Id. ¶ 11) Rico told Jimmy that his packages had arrived. Jimmy responded that "he would come and get them after work." Rico "asked him to come now," but Jimmy "said that he could not and repeated that he would be

3

home after work, which would be around 8 p.m." (Id.) "The agents were unhappy that [Rico] could not get Jimmy to return to the apartment," and they accused Rico of "lying." (Id.)

"The agents then again uncuffed [Rico] and told [him] that [he] had to sign another form." Rico "did not know or understand [the form's] contents," but he "was still terrified by the agents[,] so [he] signed the paper they gave [him]." What Rico signed was a Spanish-language U.S. Immigration and Customs Enforcement Miranda rights form. (Id. ¶ 12; Ex. D) "The agents then continued to ask [Rico] questions and [he] answered." (Rico Decl. (Dkt. No. 23) ¶ 12)

About three hours after Rico's arrest, he was taken by car to another location "where an agent asked [him] more questions which [he] also answered." (Id. ¶ 13)

## II.    SUPPRESSION HEARING

On May 29 and June 13, 2019, this Court conducted an evidentiary hearing concerning Rico's motion to suppress. The Government called Department of Homeland Security Investigations ("HSI") Agents Tyler Davila and Marcos Zegarra, while Rico called Glenn Almas, an investigator for Federal Defenders. (See May 29, 2019 Hearing Tr. (Dkt. No. 40) at 9, 142; June 13, 2019 Hearing Tr. (Dkt. No. 44) at 21)

### A.    The Government's Evidence

#### 1.    HSI's Pre-Arrest Investigation

HSI's Mail Parcel Group is responsible for intercepting packages from overseas that contain contraband, usually narcotics. When the Mail Parcel Group discovers such packages, it "attempt[s] to identify the true recipient of those packages and [to] dismantle the organization selling the drugs." (May 29, 2019 Hearing Tr. (Dkt. No. 40) at 9-10) In June 2016, the Mail Parcel Group began investigating "an organization in Mexico that was sending narcotics

4

concealed within traditional Mexican food to the Bronx area." The organization arranged for a FedEx or DHL driver on its payroll to deliver packages containing food and drugs. (Id. at 10-11) The packages typically originated from the same region in Mexico; involved the same shipper and consignee names; and had the same items listed on the manifests. (Id. at 11)

On September 3, 2018, Customs and Border Protection ("CBP") personnel in Memphis, Tennessee intercepted two packages that had been mailed in Mexico. (Id. at 11) The first package was addressed to "Luis Armando," at 1026 Castle Hill Avenue, Bronx, New York 10472, while the second package was addressed to "Armando Rico," at 2239 Bruckner Boulevard, Bronx, New York 10472. (Id. at 16) CBP opened the packages pursuant to its border search authority.[2] Inside the packages CBP personnel found "bags containing a white brownish powder . . . concealed within . . . [t]raditional Mexican food," including moles, peppers, and spices. (Id. at 12) CBP field-tested the powder in the packages; the powder tested positive for heroin. CBP then seized the packages, contacted HSI to arrange a controlled delivery, and sent the packages to HSI. (Id. at 13)

When the Mail Parcel Group received the packages, agents investigated the recipients' names and addresses. 2239 Bruckner Boulevard is a private residence that had been "used several times in the past for packages being sent [to the Bronx] from th[e] drug trafficking organization in Mexico" that the Mail Parcel Group had been investigating. The recipient for

---

[2] Pursuant to the "border search doctrine," the Federal Government has "broad plenary powers to conduct so-called 'routine' searches at the border even without 'reasonable suspicion. . . .'" United States v. Levy, 803 F.3d 120, 122 (2d Cir. 2015) (quoting Tabbaa v. Chertoff, 509 F.3d 89, 97-98 (2d Cir. 2007), and citing United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985) ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant. . . ."); see also United States v. Gaviria, 805 F.2d 1108, 1111 (2d Cir. 1986) ("It is well established . . . that searches of persons or property at the nation's borders are considered 'reasonable' within the meaning of the [F]ourth [A]mendment simply because they occur at the border." (citing United States v. Ramsey, 421 U.S. 606, 619 (1977)).

that address – "Armando Rico" – was not known to HSI, however. (Id. at 16-17, 19, 87) 1026
Castle Hill Avenue is the address for "Juices for Life," a juice bar. The juice bar is "right around
the corner from" 2239 Bruckner Boulevard, and is Defendant Rico's place of employment. (Id.
at 22) The name on the package addressed to 1026 Castle Hill Avenue – "Luis Armando" – had
been "used previously by the organization in Mexico." (Id. at 139) The Mail Parcel Group
determined "that neither of the names were [in fact] associated with the addresses" on the
packages, and believed – based on the unit's experience with the Mexican drug trafficking
organization – that "these names were most likely fictitious." (Id. at 16-17, 81)

Agent Davila – who had conducted "[w]ell over 20 or 30" controlled deliveries
before the controlled delivery in this case (id. at 79) – testified that the Mexican drug trafficking
organization had previously "used fictitious names with real addresses, and . . . rather than
bring[ing] the package to the actual address listed on the shipping label, . . . would just [have the
FedEx or DHL driver] meet a middleman at a known location and hand them the parcels there."
(Id. at 17)

## 2. The Controlled Delivery

On September 7, 2018 – pursuant to a warrant obtained from a magistrate judge in
the Southern District of New York – agents implanted GPS trackers in the packages. (Id. at 14,
17, 80, 91) Agents also replaced the heroin in the packages with a sham substance that
resembled the look and weight of the narcotics. (Id. at 14) Agent Davila then brought the
packages to a DHL processing center in Mount Vernon, New York, where a DHL manager
"reinserted [the] packages . . . into the regular mail stream." (Id. at 93; see also id. at 17, 84-85)

That same morning, the agents involved in the investigation held a tactical
meeting, which was overseen by Agent Davila, who was in charge of the controlled delivery

6

operation. (Id. at 83-84, 86, 182) At that meeting, the agents agreed on a plan to track the DHL van delivering the package, and to arrest the recipient of the packages. (Id. at 85) As discussed above – based on their experience with the Mexican drug trafficking organization – the agents did not expect the packages to be delivered to the addresses listed on the shipping labels. Instead, the agents expected that the packages would be delivered at a mutually agreed upon spot, such as a parking lot. (Id. at 26, 86)

DHL notified the agents when the packages were loaded onto a DHL van and the DHL driver commenced his delivery route. (Id. at 18, 149) The DHL driver was not informed of the investigation because "usually the drivers were on the payroll for the drug trafficking organization." (Id. at 18) The agents did not know in what order the packages would be delivered, "because the DHL drivers are allowed to make their own routes." (Id. at 94)

Davila and other agents "tail[ed] the [DHL] driver loosely" throughout the morning and early afternoon. At about 3:00 p.m., the DHL driver arrived at 2239 Bruckner Boulevard. (Id. at 18, 25, 149) The agents had not obtained a search warrant for 2239 Bruckner Boulevard because they did not expect that the package bearing that address would actually be delivered to that location. Instead, the agents expected that the package would be delivered to someone in "a parking lot or something." (Id. at 26)

Once at 2239 Bruckner Boulevard, agents[3] "observed [the DHL driver] grab one package out of his DHL van which matched the description of one of [the] target parcels. [The driver] then went to the house [at 2239 Bruckner Boulevard] and knocked on a basement door." Rico answered the door, and he and the DHL driver "began conversing, [and] gave each other

---

[3] Agent Davila parked to the left of the address, while about ten other agents – in "five or six" cars – were in the vicinity. (Id. at 25, 82) Agent Zegarra got out of his vehicle and walked towards 2239 Bruckner Boulevard, where he observed the delivery. (Id. at 150-51)

7

like a friendly high five." (Id. at 19-20) Rico "took the first package and went back into the dwelling." The DHL driver then returned to his van, picked up another parcel, "and returned to the house again." (Id. at 20) Rico stepped out of the house and met the DHL driver in the driveway. He then took the package and re-entered the house. The driver returned to his vehicle and resumed his delivery route. (Id. at 20; see also id. at 152 ("I walked right in front of them while they were making the delivery. They were standing at that gate in front of the white garage door having a conversation. The delivery driver [was] on one side of that gate and the individual on the other side. . . ."); id. at 191 ("The exchange happened outside in the driveway where the gate is. So the driver was on the sidewalk and Mr. Rico was on the inner side of that driveway."))

The agents did not then obtain an arrest warrant for Rico, or a search warrant for his apartment, because in the past they had "seen people try to move . . . drugs very quickly upon receiving them[,] and either give them to someone else or take them out and hide them somewhere." (Id. at 26) Moreover, in connection with other controlled deliveries, Davila and other agents had "found weapons, guns, knives" in the homes of those who had received the packages. (Id. at 27) Accordingly, agents "try to get in as quickly as possible," because "the quicker [they] are able to get in there and retrieve the packages and those people, the less time [they] have to worry about officer safety, of them potentially harming [the agents] while [the agents] announce [them]selves and attempt to freeze the location." (Id. at 26-27)

### 3.    The Arrest and Protective Sweep

After the DHL driver drove away, and about two or three minutes after Rico had re-entered 2239 Bruckner Boulevard, Davila and his team of about ten agents "decided to knock on the door and try to retrieve th[e] packages and anyone inside." (Id. at 22, 25, 95) The agents

8

were wearing plainclothes and ballistics vests. (Id. at 28, 106-07, 153) Some of the ballistics vests had police markings while others did not. The agents were carrying firearms. (Id. at 28)

Six agents, including Davila and Zegarra, approached the ground floor entrance. (Id. at 97, 153-54) Three "went along the stairwell" – the external wall of the staircase leading up to the main entrance of the house – while another three "kind of catercornered in between the door and the garage door on the other side." In essence, three agents were stationed on each side of the ground floor entrance. (Id. at 27) Agent Davila stood with the group of agents on the right side of the entrance, against the garage door. (Id. at 98) The remaining agents took positions near the end of the driveway. (Id. at 27, 28)

The ground floor entrance had two doors: an outer, glass storm door, and an interior solid wood door. (Id. at 29, 99, 155) Agent Zegarra – who was nearest to the entrance – opened the storm door and knocked on the wood door, saying "Police. Open the door." (Id. at 29, 31, 103, 154-55) Agent Zegarra testified that his weapon was drawn and was pointed "[a]t the door" when he knocked. (Id. at 153, 156) Agent Davila did not recall if he had his weapon drawn, but testified that other agents' weapons were drawn, in accordance with standard protocol when executing an arrest. (Id. at 31) According to Davila, the agents whose weapons were drawn were not pointing their weapons at the door: the pistols "were in . . . a ready position . . . facing down." (Id. at 97)

After about thirty seconds, Rico opened the wood door – which opens inward – and stepped into the door's threshold. (Id. at 32, 36, 101, 157) Zegarra said "Police. Don't move," and ordered Rico to "show me your hands." (Id. at 103, 157) Rico "kind of froze up [and] got . . . tense out of fear"; he "was very wide-eyed and kind of just had a look of surprise on his face." (Id. at 32, 106) Rico showed the agents his hands. (Id. at 157) He was then

9

standing "right in the middle of the doorway." Agent Zegarra grabbed Rico and pulled him out of the doorway. (Id. at 36, 105, 157-58; see also id. at 158 ("He was in the doorway. He was halfway in the doorway in the building. . . . [O]nce we identified ourselves . . . he kind of peeked out to see who we were."))

Agent Zegarra "passed [Rico] out to the hands team" – agents designated to detain anyone encountered on the premises – and a female agent attempted to detain him. Rico resisted, however. His fists were clenched, he was tense, and "[h]e kept saying '[n]o, no, no, no' and was not complying with [the female agent's] commands to get on the ground." (Id. at 31-32, 107) Agent Davila – who was also on the hands team (id. at 105) – then intervened, performing a "straight-arm takedown." Davila grabbed Rico's wrist and took control of Rico's arm just above the elbow. He then bent forward, guiding Rico's shoulder towards the ground. (Id. at 33) Once Rico was on the ground, Davila grabbed Rico's wrists, swept them behind Rico's body, pinned one of Rico's arms between his own legs, and placed handcuffs on his wrists. (Id. at 34) Rico continued to say "[n]o, no, no, no." (Id. at 35) Davila did not slam Rico into the ground and did not knee him in the face, and Rico did not complain that he was injured. (Id. at 35-36)

Once Rico was handcuffed, Davila "sat him up," asked if he was okay, and asked whether Rico had sustained any injuries. Rico said that he was okay. Davila asked Rico, in English, for his identification. (Id. at 37, 108-109) Rico responded – in English – that he had identification inside his home. The agents asked Rico whether he would give them permission to take him back into his residence to retrieve his identification, and Rico said yes. (Id. at 40, 108-09)

While Davila was in the process of detaining Rico, Agent Zegarra and other agents conducted a protective sweep.[4] (Id. at 37, 160-63) The agents entered 2239 Bruckner Boulevard looking for people who might be inside, and sought to clear the premises. (Id. at 37-38) The wood door led to a "square area," to the right of which is a narrow hallway. (Id. at 42, 161; June 13, 2019 Tr. (Dkt. No. 44) at 223-24) The hallway led, on its left side, to a stairway to the second floor. (May 29, 2019 Tr. (Dkt. No. 40) at 42; 161; June 13, 2019 Tr. (Dkt. No. 44) at 229-30)

Past the staircase, and at the end of the approximately 20-foot long hallway, is a separate door that leads to Rico's ground floor apartment. (May 29, 2019 Tr. (Dkt. No. 40) at 44, 100, 161) Agent Zegarra and other agents proceeded to the door of Rico's apartment and "called out to see if anybody else was in that apartment." (Id. at 162, 225) The agents then encountered Rico's two mariachi band performers. (Id. at 38, 162) They were handcuffed and escorted out of the premises. (Id. at 38-39, 163)

The agents then observed a single room studio apartment, about 20 feet wide by 20 feet long. (Id. at 110; June 13, 2019 Tr. (Dkt. No. 44) at 227) The apartment contained a bed, a couch, and a kitchen area. On the right side of the apartment, the agents "could see the DHL packages on a chair or a stool." (May 29, 2019 Tr. (Dkt. No. 40) at 163)

### 4. *Miranda* **Warnings and Consent to Search**

After the protective sweep, Davila brought Rico – who was still handcuffed – back into his apartment. (Id. at 40-41, 163) Rico walked on his own; he was not dragged into the apartment. (Id. at 41) Once Rico was inside the apartment, Agents Davila and Zegarra sat Rico down on the couch, explained that they were federal agents, and told Rico that they were

---

[4] Zegarra testified that Davila took part in the protective sweep. This is inconsistent with Davila's testimony. (See id. at 39, 163)

11

conducting a narcotics investigation and that the two packages he had accepted contained narcotics. Both agents' weapons were holstered at this time. (Id. at 44-45, 165) Davila retrieved Rico's identification, and learned that his name was Armando Rico. (Id. at 44-45)

Davila – who had been speaking in English, and who is not fluent in Spanish – asked Rico "what his preferred language was." Rico said that his preferred language was Spanish, and Agent Zegarra then began translating Davila's words into Spanish, and Rico's responses into English. (Id. at 45)

A conversation then ensued between Rico and the agents. According to Davila, "[a]fter [the agents] explained why [they] were there," Rico "made a spontaneous utterance saying that the packages weren't his and neither were two duff[el] bags that were in the residence. They belonged to his friend Jimmy." (Id. at 45, 111) Davila testified that, up to this point, neither agent had asked Rico whether there were any weapons or drugs in the apartment. (Id. at 110)

Zegarra testified, however, that after Rico was sat down on the couch, he "asked [Rico] if there were any drugs or weapons in the immediate area." (Id. at 165, 166) Zegarra explained that he asked this question "for safety reasons . . . [i]t was a safety concern since the defendant at this point was uncuffed." (Id.) Zegarra was then speaking in English and Rico responded in English. Rico told the agents "that there could be something underneath the bed or in the couch, or in the closet, like in a bookbag in the closet." "Soon thereafter [Zegarra] asked [Rico] if he was more comfortable speaking in Spanish," and Rico responded in the affirmative. (Id. at 164, 166) From that point on, Zegarra spoke to Rico in Spanish. (Id. at 171-72)

Both Zegarra and Davila testified that after Rico made a statement about items in his apartment, he was given Miranda warnings. (Id. at 45, 48, 167) According to Davila, he

12

"halted the conversation" after Rico stated that the packages and duffel bags in the apartment were not his. Davila told Rico that he "wanted to ask him more questions about the packages and about Jimmy and those duffel bags but before that [he] wanted to read [Rico] his rights." (Id. at 47) According to Davila, Agent Zegarra then read Miranda warnings to Rico in Spanish, and provided Rico with a written Miranda form in Spanish. According to Davila, it was at this point that the agents uncuffed Rico, so that he could "just read the [Miranda] form at his leisure." (Id. at 48-50) The agents "asked [Rico] to read each line [on the Miranda form], and, if he understood [the line], to initial next to each line, and then at the bottom, if he agreed to talk to [the agents] and answer questions, to sign and date" the form. (Id. at 48-49)

Zegarra similarly testified that he "read each sentence [on the Miranda form to Rico in Spanish]. Immediately after reading the sentence," he "gave [Rico] the opportunity to read the sentence, and [Rico] initialed before moving on to the next sentence. [Zegarra and Rico] followed [in] this manner to the end of the form." (Id. at 168) Rico "indicated that he understood everything and that he didn't have any questions for [the agents]." (Id. 169) Both Zegarra and Davila observed Rico read and sign the Miranda form, and both agents signed the form as witnesses. (Id. at 48-51, 169; see also GX 3 (signed Spanish-language Miranda form, with the initials "A.R." to the left of each line)) Rico signed the Miranda form about five minutes after he was returned to the apartment. (May 29, 2019 Tr. (Dkt. No. 40) at 135)

The agents then asked Rico about the packages he had accepted from the DHL driver. Rico "at first denied knowing what [was] in the DHL packages, but later on he admitted to knowing" that they contained cocaine.[5] (Id. at 172) Rico told the agents that the packages were "Jimmy's" and not his. The agents also asked Rico about the duffel bags he had

---

[5] As noted above, the DHL packages contained heroin, not cocaine.

13

mentioned. Rico responded "that there were two duffel bags, one located under his bed and one located in the closet[,] and that they both contained drugs." (Id. at 52; see also Tr. 172 (Rico said "[t]hat we could find an additional bag underneath the bed and possibly . . . [drugs] in the bookbag in the closet"))

The agents then told Rico – again, through Agent Zegarra's translation – that they wanted Rico's consent to search the apartment to locate the duffel bags and retrieve the DHL packages, as well as "to find anything else that was in the apartment." (Id. at 53) They provided Rico with a Spanish-language consent-to-search form. (Id. at 53, 172) Agent Zegarra read the form to Rico, and Rico then read the form to himself. (Id. at 54, 56) Agent Zegarra asked Rico, in Spanish, if he had any questions and if he understood the form, and Rico responded, in Spanish, that he understood it. Rico then signed and dated the form.[6] (Id. at 56-57, 173; GX 4) He remained uncuffed at this time. (May 29, 2019 Tr. (Dkt. No. 40) at 55-56) Davila – through Zegarra – then asked Rico if everything in the apartment belonged to him. Rico responded "that everything in the apartment was his with the exception of the two parcels and the two duffel bags that he claimed were Jimmy's."[7] (Id. at 58, 125)

The agents then re-cuffed Rico and took him out to the hallway. (Id. at 59) Once in the hallway, the again uncuffed Rico and resumed questioning him. As before, Davila asked questions in English, which Zegarra translated into Spanish. Rico responded in Spanish, with

---

[6] The signature on the consent-to-search form reads "A. Rico." This signature is not similar to the signature on the Miranda form. (Compare GX 3 with GX 4; see also May 29, 2019 Tr. (Dkt. No. 40) at 134) Although Davila conceded that the signatures on the two forms appear "different," he reiterated that he was present when both forms were signed, and that no one else signed Rico's name on either form. (Id. at 134, 142) Rico, for his part, states that he signed both forms. (See Rico Decl. (Dkt. No. 23) ¶¶ 9, 12)

[7] Zegarra recalls a similar exchange with Rico (see id. at 174-75 ("The defendant mentioned that an individual temporarily stayed with him and that the packages delivered were his and the drugs and the bag were his, that other individual.")), but testified that this exchange took place after he, Davila, and Rico had moved from the couch area to the hallway. (Id.)

14

Zegarra translating his responses into English. (Id. at 60-61) While in the hallway with Rico, the agents were joined by Special Agent Pablo Huerta, who is fluent in Spanish. (Id. at 74)

Once in the hallway, Rico "began to tell [the agents] that he met this gentleman known as Jimmy, Jimmy Mexico . . . at the juice bar where he worked" – Juices for Life – "and that Jimmy . . . would ask to stay at his apartment sometimes." (Id. at 62) Rico "knew Jimmy to be a drug dealer," and "Jimmy would ask [Rico] to receive packages on Jimmy's behalf, and that [Rico's] role was to accept these packages, separate the drugs from the food, and then . . . store them until Jimmy would come back and sell the narcotics." (Id.) Jimmy paid Rico $500 for taking delivery of the packages.[8] (Id. at 62, 177-78)[9]

Rico further stated that he communicated with Jimmy by phone, and that "he had conversations regarding drug trafficking" on his phone. (Id. at 63-64) The agents asked if they could see those conversations and Jimmy's contact information. Rico "pull[ed] up the conversations and the contact info for Jimmy Mexico." (Id. at 64) He showed the agents "two conversations in particular." (Id. at 65) In one text message Rico had received at about 3:00 p.m. that day – shortly "after [Rico had] receiv[ed] the packages, [but] before [the agents had] knocked on the door" (id. at 140) – "Jimmy was expressing frustration[] because he did not want Rico to accept both packages." One of the packages "was supposed to go to . . . Juices for Life." (Id. at 66, 69) Rico confirmed that the packages referred to in the text message were the DHL packages he had received that day. (Id. at 72)

---

[8] Agent Davila testified that Rico said that Jimmy paid him $500 per package; Agent Zegarra testified that Rico said that Jimmy paid him $500 per month. (Id. at 62, 177-78)

[9] Agent Davila testified that Rico said that he had been receiving packages for Jimmy for about a year, while Agent Zegarra testified that Rico said that he had been so engaged "for a couple of months." (Id. at 62, 177)

15

The agents then asked Rico "if he would get in touch with Jimmy and tell Jimmy to come pick up the packages." (Id. at 72) Rico agreed and called Jimmy on his phone, using the speaker function. Rico told Jimmy that the packages had arrived and to pick them up.[10] (Id. at 72-73) Zegarra testified that "Jimmy was asking awkwardly about a UPS package rather than a DHL package," and said he would come pick up the packages later. He "then quickly, abruptly hung up." The agents concluded "that Jimmy . . . knew that something [had] happened." (Id. at 73)

In addition to the phone on which Rico and Jimmy spoke, agents recovered several other phones from Rico's apartment. (Id. at 74) The agents asked Rico to consent to a search these phones, and Agent Huerta handed Rico a consent-to-search form for these devices. (Id.) This form was in English, because the agents had no more Spanish-language forms. (Id. at 76; GX 5 (consent-to-search form for electronic devices)) Davila directed Huerta to twice "read the form line-by-line in Spanish" to Rico. (May 29, 2019 Tr. (Dkt. No. 40) at 76) Next to the heading "Witnesses," there is handwriting that reads: "SA Pablo Huerta read this form to the subject in Spanish. Armando Jarquin said he understood and subsequently signed." The form bears Rico's printed name, and a signature.[11] (Id.; GX 5) After Rico signed this consent-to-search form, Agent Zegarra "browsed through some of the chat applications . . . to read . . . the

---

[10] Zegarra testified that while the agents were questioning Rico in the hallway, he "kept getting phone calls from that individual [who sometimes stayed at Rico's apartment]." The agents "allowed Mr. Rico to answer the phone and to try to convince that individual to come back to the residence to pick up his package." These conversations took place using the speaker function on Rico's phone. (Id. at 176)

[11] "Armando Jose Jarquin Rico" is printed on the "Name" line. The distinctive printing of "Rico" on this form is very similar to the printed "Rico" on the signature line of the Spanish-language consent-to-search form for Rico's apartment. (Compare GX 5 with GX 4) Moreover, the distinctive signature on the consent-to-search form for Rico's electronic devices is very similar to the signature shown on the Spanish-language Miranda warnings form. (Compare GX 5 with GX 3)

16

chat message exchanges." Zegarra saw messages that concerned "substance delivery and when to pick up . . . packages. Like packages are being delivered, you know, we got this package, come pick it up . . . ." (May 29, 2019 Tr. (Dkt. No. 40) at 177)

The agents instructed Rico to continue calling Jimmy, but "Jimmy was kind of ignoring his phone calls, so after about an hour or so [the agents] decided to call it quits." Davila left the premises with Rico at about 6:00 p.m. (Id.) Davila later learned from the search team that two duffel bags were recovered from the apartment, each containing 20 wrapped bricks of heroin. (Id. 78-79, 124)

### B.    Defendant's Evidence

Glenn Almas, an investigator for Federal Defenders of New York, testified on behalf of Rico. On June 12, 2019, Almas took photographs of 2239 Bruckner Boulevard, including photographs of the door to the ground floor entrance. (See June 13, 2019 Tr. (Dkt. No. 44) at 232-33, 235; DX A-C) Almas also entered 2239 Bruckner Boulevard through the ground floor entrance. Upon entering, Almas observed an "alcove-like area," which led to a hallway about a hundred feet long. There is an apartment at the end of the hallway. (June 13, 2019 Tr. (Dkt. No. 44) at 234)

### C.    Factual Findings and Credibility Determinations

As is apparent from the Court's factual summary, Rico's declaration and the agents' testimony present a number of sharp factual disputes concerning, inter alia, the amount of forced used by the agents in arresting Rico, the sequence of events inside Rico's residence, whether Rico made statements in response to interrogation prior to receiving Miranda warnings, and whether Rico's waiver of Miranda rights and consents to search were knowing and voluntary.

17

As an initial matter, the Court gives less weight to the allegations in Rico's declaration – which were not tested by cross-examination – than to the live testimony offered at the hearing. See, e.g., United States v. Taylor, No. 11 CR. 310 PGG, 2011 WL 4357350, at \*4 n.12 (S.D.N.Y. Sept. 19, 2011) ("While this Court has considered both Taylor's declaration and the officers' testimony on the issue of probable cause, the latter is entitled to more weight, because it was subject to cross-examination and is found by this Court to be credible."); United States v. Thompson, No. 10 CR. 94 JSR, 2010 WL 3069668, at \*5 (S.D.N.Y. July 29, 2010) ("[B]ecause the defendant (as is his right) chose not to testify at the evidentiary hearing, the assertions in his affirmation can neither be tested by cross-examination nor corroborated by the Court's observation of his demeanor. . . . [T]hough defendant's decision not to testify may not itself be held against him, his hearsay assertions . . . may not be worth much in the absence of corroboration, whether from the defendant or otherwise."); United States v. Fuentes, No. 07 Cr. 329 (SHS), 2007 WL 2319142, at \*4 (S.D.N.Y. Aug. 10, 2007) (crediting witness testimony over defendant's sworn statement regarding whether he gave consent); United States v. Robles, 253 F. Supp. 2d 544, 549 n.14 (S.D.N.Y.2002) (noting that courts "'give greater weight to [witness] testimony, which was subject to cross examination, than to [sworn] affidavits'" (quoting United States v. Gardner, 611 F.2d 770, 774 n. 2 (9th Cir. 1980), and citing United States v. Frank, 8 F. Supp. 2d 284, 291 n.2 (S.D.N.Y. 1998) (crediting witness testimony over affidavit because the affidavit was not subject to cross-examination and the testifying witnesses were credible)); United States v. Long Huang You, 198 F. Supp. 2d 393, 401 n.8 (S.D.N.Y. 2002) (same); United States v. Juliano, No. 99 Cr. 1197 (AGS), 2000 WL 1206745, at \*3 n.1 (S.D.N.Y. Aug. 24, 2000) (affording less weight to defendant's affidavit, because the court could not assess the defendant's credibility and the testimony of Government witnesses was "forthright and

truthful"). Accordingly, "the Court places little weight on [Rico's] declaration insofar as it conflicts with the consistent and credible live testimony from the [agents] that was subjected to vigorous cross-examination." United States v. Deleston, No. 15-CR-113 PKC, 2015 WL 4745252, at *5 (S.D.N.Y. July 24, 2015).

As to the credibility of the agents, while there are a number of minor discrepancies in their testimony,[12] they were generally credible witnesses.

With respect to the degree of physical force used in arresting Rico, the Court concludes that while Rico was taken to the ground outside the ground floor entrance, he was not "slammed . . . to the ground" by the agents, and he was not "dragged . . . back inside [his] apartment." (Rico Decl. (Dkt. No. 23) ¶¶ 7-8) The Court concludes that minimal and proper force was used in arresting Rico, and that he walked back through the ground floor entrance and into his apartment under his own power.

As to whether Rico was subjected to custodial interrogation prior to receiving Miranda warnings, Davila and Zegarra disagree as to the substance of their initial exchange with Rico after he was brought back into his apartment. Agent Davila testified that after Rico was seated on the couch, he and Zegarra explained that they were federal agents, that they were conducting a narcotics investigation, and that the two packages that Rico had accepted contained narcotics. (May 29, 2019 Tr. (Dkt. No. 40) at 44-45) Davila further testified that Rico then "made a spontaneous utterance saying that the packages weren't his and neither were two

---

[12] For example, Agent Zegarra recalls that Agent Davila participated in the protective sweep, while Davila's testimony indicates that he did not; Agent Davila recalls that Rico said that he had been accepting packages for Jimmy for about a year, while Agent Zegarra stated that Rico had said a "couple of months"; and Agent Davila recalls that he asked Rico to call Jimmy, while Agent Zegarra testified that – while the agents were questioning Rico – he "kept getting calls from [the] individual [who sometimes stayed in his apartment]." For the most part, the inconsistencies between the agents' testimony are minor, and are not relevant to the arguments that Rico raises here.

duff[el] bags that were in the residence. They belonged to his friend Jimmy." (Id. at 45, 111) According to Agent Davila, neither he nor Agent Zegarra asked Rico – prior to administering Miranda warnings – whether there were any weapons or drugs in the apartment. (Id. at 110)

Agent Zegarra testified that immediately after Rico was sat down on the couch, his handcuffs were removed. Agent Zegarra then asked Rico "if there were any drugs or weapons in the immediate area," and Rico said "that there could be something underneath the bed or in the couch, or in the closet, like in a bookbag in the closet." (Id. at 165, 167) Rico made this statement before Miranda warnings were given. (Id. at 167)

The Court concludes that Agent Davila explained to Rico at the outset – while he was seated on the couch – that he and Zegarra were federal agents, that they were conducting a narcotics investigation, and that the packages he had received contained narcotics. The Court further concludes that Rico then said – prior to any questioning from the agents – that the packages were not his, and that they belonged to his friend "Jimmy." Rico did not allude to the two duffel bags in the apartment at that point. The Court further finds that one or both agents then asked Rico what his preferred language was, and that Rico stated that he was more comfortable speaking in Spanish. Agent Zegarra then began speaking Spanish to Rico, and translating Rico's responses into English for Davila.

Agent Zegarra then asked Rico whether there were any drugs or weapons in the apartment. Rico had not yet been given Miranda warnings. Rico told Agent Zegarra "that there could be something underneath the bed or in the couch, or in the closet, like in a bookbag in the closet." (Id. at 165, 167) Agent Zegarra then administered Miranda warnings to Rico in Spanish, using the Spanish-language Miranda warnings form admitted as GX 3. (Id. at 45, 47-48, 167)

The Court rejects as not credible Rico's assertions that he did not read and did not understand the Miranda warnings form and the consent-to-search forms that he admits that he signed. (Rico Decl. (Dkt. No. 23) at ¶¶ 9, 12) As to the Spanish-language Miranda warnings form – which the agents testified Zegarra read line-by-line to Rico – Rico asserts he "did not know or understand the contents" of the form, and signed it because he was "terrified." Rico does not address the fact that his initials appear next to each line of the Miranda form, however, which tends to corroborate the agents' testimony that the form was in fact read to Rico line-by-line.

As to the two consent-to-search forms, Rico claims that the agents "shoved two forms in my face and told me to sign them." Rico says that he "tried to read the forms but could not," because he "was too terrified to read past the first few words." (Id. at ¶ 9) The Court accepts as credible, however, Agent Davila and Agent Zegarra's testimony that Zegarra read these forms aloud to Rico; that the agents observed Rico reading the Spanish-language consent-to-search form for his apartment; and that Rico responded in the affirmative when asked if he understood the forms.

The Court credits the agents' testimony that when they provided the Miranda rights form, the consent to search form for Rico's apartment, and the consent to search electronic devices form to Rico, the forms were read to him; he was given an opportunity to read the Spanish-language forms; and that Rico told the agents that he understood each form. While Rico claims that he was "terrified" throughout his encounter with the agents, there is no support for this assertion in the record. The agents did not physically abuse Rico, did not threaten him, and did not display their weapons when questioning him. Rico was not handcuffed when questioned, and the agents' interrogation was not inordinately lengthy.

21

## DISCUSSION

## I.    RICO'S MOTION TO SUPPRESS

Rico contends that this Court should suppress "all evidence and statements" the Government obtained following his arrest because: (1) the agents illegally installed the GPS tracking devices in the DHL packages; (2) the warrantless arrest of Rico is unconstitutional, because it took place in a location protected by the Fourth Amendment and no exigent circumstances justified the arrest; (3) use of Rico's pre-Miranda statements would violate the Fifth Amendment; and (4) Rico did not consent to the search of his apartment or electronic devices, and did not voluntarily waive his Miranda rights. (Def. Br. (Dkt. No. 43))

The Government responds that Rico's motion should be denied because: (1) Rico lacks standing to challenge the installation of the tracking devices, and any unauthorized installation of those devices amounts to no more than a "technical oversight"; (2) the warrantless arrest of Rico was lawful because (a) it did not take place inside his home; and (b) there were exigent circumstances; (3) Rico's pre-Miranda statements were not the product of custodial interrogation; and (4) Rico voluntarily waived his Miranda rights and voluntarily consented to the search of his apartment and electronic devices. (Govt. Br. (Dkt. No. 46))

## II.    GPS TRACKING DEVICES

### A.    Court Order Authorizing Installation of GPS Tracking Devices

At the suppression hearing, Agent Davila testified that the Government sought and obtained an order from a U.S. Magistrate Judge sitting in the Southern District of New York authorizing installation of GPS tracking devices in the two intercepted DHL packages. Agent Davila further testified that HSI agents working on the controlled delivery installed the GPS

22

tracking devices in the DHL packages at HSI's offices in Jamaica, Queens. (May 29, 2019 Tr. (Dkt. No. 40) at 17, 81-82, 91) Jamaica, Queens is located in the Eastern District of New York.

Rico contends that HSI agents could not implant GPS tracking devices "without valid judicial approval," and that – although agents obtained a court order from a judge in this District authorizing the use of GPS tracking devices – the agents "install[ed] . . . the [tracking] devices outside the jurisdiction of the issuing judge," thereby "render[ing] their installation an unlawful search." (Def. Br. (Dkt. No. 43) at 28)

The Government concedes that the tracking devices were installed outside the Southern District, but argues that this "was a technical mistake," to which "the drastic remedy of exclusion should not apply." (Govt. Br. (Dkt. No. 46) at 26) The Government further contends that Rico lacks standing to challenge the use of the GPS tracking devices, because he "disclaimed ownership over both parcels. . . ." (Id. at 26-27 (emphasis omitted))

## B.     Whether Rico Has Standing to Challenge the Installation of the GPS Tracking Devices

### 1.     Applicable Law

A defendant challenging a search bears the burden of establishing "Fourth Amendment standing."[13] The Fourth Amendment standing inquiry focuses on "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." Rakas v. Illinois, 439 U.S. 128, 140 (1978). The defendant must show that "he had a legally cognizable privacy interest in the searched premises at the time of the search." United States v. Ruggiero, 824 F. Supp. 379, 392-93 (S.D.N.Y. 1993),

---

[13] The parties do not dispute – and the Supreme Court has recognized – that the installation of a GPS tracking device on an individual's property constitutes a Fourth Amendment search. See United States v. Jones, 565 U.S. 400, 404 (2012) ("We hold that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movement, constitutes a 'search.'" (footnote omitted)).

aff'd sub nom. United States v. Aulicino, 44 F.3d 1102 (2d Cir. 1995). This standard is met where a defendant shows "(a) that he had an expectation of privacy that society is prepared to recognize as reasonable, and (b) that he had conducted himself and dealt with the property in a way that indicated a subjective expectation of privacy." United States v. Perea, 986 F.2d 633, 639 (2d Cir. 1993).

A defendant "need not be the owner of the property for his privacy interest to be one that the Fourth Amendment protects." Id. at 639-40. "A person who possesses personalty belonging to another and who has the right to exclude third persons from possession of that property has an interest that is likewise protected." Id. at 640 (citing United States v. Ochs, 595 F.2d 1247, 1253 (2d Cir. 1979) (concluding that although defendant asserted no possessory interest in the property searched, he nonetheless had Fourth Amendment standing, because "the record shows that he had a possessory interest")).

## 2. **Analysis**

In arguing that Rico lacks standing to challenge the installation of the GPS tracking devices, the Government emphasizes that Rico "disclaimed ownership over both parcels." (Govt. Br. (Dkt. No. 46) at 26-27 (emphasis omitted)) Rico told the agents that "the packages weren't his. . . . [and that] [t]hey belonged to his friend Jimmy." (May 29, 2019 Tr. (Dkt. No. 40) at 45, 111)

Depending on the circumstances, a defendant who "disclaim[s] ownership" of property may not have Fourth Amendment standing to challenge a search of that property. See, e.g., United States v. Powell, 732 F.3d 361, 374 (5th Cir. 2013) (defendant who "disclaimed personal connection to [a] phone" lacked standing to challenge "the admissibility of the phone and the records contained therein"); United States v. Tolbert, 692 F.2d 1041, 1044-45 (6th Cir.

24

1982) (where defendant "insisted that she was traveling without luggage and specifically disclaimed ownership of the bag in issue," defendant "c[ould] hardly assert that she exhibited an . . . expectation of privacy respecting the luggage" (internal quotation marks omitted)); United States v. Miller, 589 F.2d 1117, 1131 (1st Cir. 1978) ("[O]ne who disclaims any interest in luggage thereby disclaims any concern about whether or not the contents of the luggage remain private."). As discussed above, however, Fourth Amendment coverage is not co-extensive with ownership, and a defendant "need not be the owner of the property for his privacy interest to be one that the Fourth Amendment protects." Perea, 986 F.2d at 639-40.

Here, although Rico stated that Jimmy was the owner of the packages, he also admitted that he had agreed to (1) have packages mailed to him; (2) "receive packages on Jimmy's behalf"; and (3) "store [the packages] until Jimmy would come back." Rico also admitted that he knew the packages contained narcotics, and stated that Jimmy paid him $500 for agreeing to take delivery of the packages. (May 29, 2019 Tr. (Dkt. No. 40) at 62, 172, 177-78) Moreover, one of the packages was addressed to Rico, bearing both his name and address.

Given these circumstances, the Court concludes that Rico had a possessory interest in the packages, and had the ability to exclude others from possessing the packages. Accordingly, Rico has standing to challenge the installation of the GPS tracking devices on the packages. See Ochs, 595 F.2d at 1253 (defendant had standing to challenge search of another's car, where defendant, "[e]xcept with respect to the owner, . . . had complete dominion and control over the car and could exclude others from it" (internal quotation marks omitted)); United States v. Bodnar, No. 3:17CR157 (JBA), 2019 WL 582478, at *5 (D. Conn. Feb. 13, 2019) ("A bailee of luggage, i.e. a person in temporary possession of luggage belonging to another, may have a legitimate expectation of privacy in that luggage."); United States v.

Hernandez, 313 F.3d 1206, 1209 (9th Cir. 2002) ("It has long been established that an addressee has both a possessory and a privacy interested in a mailed package."); United States v. Koenig, 856 F.2d 843, 846 (7th Cir. 1988) (concluding that one defendant lacked standing to challenge search of package that was the subject of a controlled delivery, "[b]ecause [he] was neither the sender nor the addressee," but ruling that co-defendant – to whom the package was delivered – "ha[d] a privacy interest in her mail and so may test the legality of the conduct used to search and seize the same"); United States v. Notyce, No. CR 16-00556 JMS, 2017 WL 5137584, at *5 (D. Haw. Nov. 6, 2017) (ruling that defendant lacked standing to challenge search of a package where "[t]he parcel was not addressed to him or a physical location associated with him"); United States v. Johnson, 25 F. Supp. 3d 1034, 1037 (W.D. Mich. 2014) (ruling that defendant lacked standing to challenge search of envelope, where he did not "assert[] . . . that the envelope was addressed to him, or that it was mailed to his address.")

## C. Whether the Installation of the GPS Tracking Devices Was Unauthorized

Federal Rule of Criminal Procedure 41(b)(4) provides that "a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize the use of the device to track the movement of a person or property located within the district, outside the district, or both." Fed. R. Crim. P. 41(b)(4). "Rule 41(b)(4) requires that a tracker be 'install[ed] within the district.'" United States v. Werdene, 883 F.3d 204, 212 (3d Cir. 2018) (citation omitted). Accordingly, the warrant issued here authorizing the use of the GPS tracking devices required installation of the devices in the Southern District of New York. It is undisputed, however, that the HSI agents installed GPS tracking devices in the DHL packages in the Eastern District of New York, in violation of the

26

warrant. (May 29, 2019 Tr. (Dkt. No. 40) at 17, 81-82; Def. Br. (Dkt. No. 43) at 7; Govt. Br. (Dkt. No. 46) at 26)

## D. Whether the Unauthorized Installation of the GPS Tracking Devices Warrants Suppression

### 1. Applicable Law

"The Fourth Amendment . . . 'contains no provision expressly precluding the use of evidence obtained in violation of its commands.'" Herring v. United States, 555 U.S. 135, 139 (2009) (quoting Arizona v. Evans, 514 U.S. 1, 10 (1995)). However, "[t]he exclusionary rule was adopted to effectuate the Fourth Amendment right of all citizens 'to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,'" United States v. Calandra, 414 U.S. 338, 347 (1974) (citation omitted), and pursuant to the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." Id. (citing Weeks v. United States, 232 U.S. 383 (1914); Mapp v. Ohio, 367 U.S. 643 (1961)).

"The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies," however. Herring, 555 U.S. at 140 (citing Illinois v. Gates, 462 U.S. 213, 223 (1983)); see also Calandra, 414 U.S. at 348 ("Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons.") Rather, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct," or "recurring or systemic negligence." Herring, 555 U.S. at 144. "To trigger the exclusionary rule, [law enforcement] conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system" – namely, "letting guilty and possibly dangerous defendants go free." Id. at 141, 144.

27

## 2.    **Analysis**

"Courts have repeatedly held that suppression is rarely the proper remedy for a Rule 41 violation." United States v. Deas, No. 3:07-CR-73 (CFD), 2008 WL 5063901, at *2 (D. Conn. Nov. 24, 2008). "Rather, failure to comply with the requirements of Rule 41 should result in suppression only where '(1) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.'" United States v. Ahmad, No. 11-CR-6130L, 2012 WL 1944615, at *8 (W.D.N.Y. May 29, 2012) (quoting United States v. Pangburn, 983 F.2d 449, 455 (2d Cir. 1993)), report and recommendation adopted, No. 11-CR-6130L, 2012 WL 3028302 (W.D.N.Y. July 24, 2012). Moreover, "[a]lthough [this case presents] a violation of the warrant itself, rather than a violation of Rule 41 per se, . . . the same analysis applies to technical violations of the warrant. If non-prejudicial and unintentional violations of Rule 41 do not result in suppression, then a fortiori technical violations of the warrant itself compel the same result." United States v. Sims, 428 F.3d 945, 955 (10th Cir. 2005).

Here, the agents' installation of the tracking devices in the Eastern District of New York is a "technical" violation, and there is no evidence that the violation was intentional or that it caused prejudice to Rico. Accordingly, although the agents disregarded the geographic limitation of the warrant, their conduct does not justify suppression. Cf. Ahmad, 2012 WL 1944615, at *8 (in a case involving search warrants executed after the time period specified in the warrants, explaining that "[c]ourts have declined to order suppression . . . where probable cause still existed at the time of the execution and the police did not deliberately disregard the terms of the warrant" ); see also United States v. Filippi, No. 5:15-CR-133 BKS, 2015 WL

5789846, at *6-7 (N.D.N.Y. Sept. 9, 2015) (failure to comply with search warrant's 60-day deadline for searching cell phone amounted to a "technical" violation where "there is no evidence that the government acted in bad faith or with deliberate disregard of the search warrant deadline"; suppression denied).

Even assuming arguendo that the agents' violation of the warrant amounts to a constitutional violation,[14] suppression would not be warranted under Herring and its progeny. Applying the "cost/benefit analysis [Herring] require[s]," United States v. Julius, 610 F.3d 60, 67 (2d Cir. 2010), the cost of suppression here outweighs its benefits, as the violation is not "deliberate, reckless, or grossly negligent," Herring, 555 U.S. at 144, but instead is akin to "mere administrative negligence," which suppression would be unlikely to meaningfully deter. Julius, 610 F.3d at 67. Accordingly, to the extent that Rico's motion to suppress is premised on unauthorized installation of GPS tracking devices in the Eastern District of New York, the motion will be denied.

## III.   WARRANTLESS ARREST

The HSI agents arrested Rico without a warrant. Rico claims that this warrantless arrest is unconstitutional because (1) he was arrested in the hallway of 2239 Bruckner Boulevard, and he had a reasonable expectation of privacy in the hallway; and (2) the agents' "physical intrusion into Mr. Rico's home constituted a trespass." (Def. Br. (Dkt. No. 43) at 14, 16-17 (capitalizations altered))

The Government contends that (1) Rico was arrested not in the hallway but rather at the threshold of the ground floor entrance of 2239 Bruckner Boulevard; (2) even if Rico were

---

[14] "Violations of Rule 41 do not necessarily rise to the level of constitutional violations. . . ." Ahmad, 2012 WL 1944615, at *8 (citing United States v. Burke, 517 F.2d 377, 384, 386 (2d Cir. 1975)).

arrested in the hallway, he had no reasonable expectation of privacy in the hallway; and (3) even if he had a reasonable expectation of privacy in the hallway, exigent circumstances justified the warrantless arrest. (Govt. Br. (Dkt. No. 46) at 15-19)

## A.    **Applicable Law**

"A warrantless arrest is unreasonable under the Fourth Amendment unless the arresting officer has probable cause to believe a crime has been committed or is being committed." United States v. Delossantos, 536 F.3d 155, 158 (2d Cir. 2008) (citing Devenpeck v. Alford, 543 U.S. 146, 152 (2004); United States v. Watson, 423 U.S. 411, 417 (1976)); see also United States v. Torres, No. 05-CR-838(NGG), 2006 WL 1982750, at *2 (E.D.N.Y. July 13, 2006) ("Where a police officer has probable cause to believe that someone has committed a felony in a public area, the officer may arrest that person immediately without a warrant." (citing Watson, 423 U.S. at 418)).  Even where probable cause exists, however, the Fourth Amendment "prohibits law enforcement officials from making a warrantless . . . entry into a suspect's home to arrest him," in the absence of exigent circumstances. United States v. Allen, 813 F.3d 76, 78 (2d Cir. 2016) (citing Payton v. New York, 445 U.S. 573 (1980)).

The premise for the prohibition on warrantless arrests in a person's home is that individuals have a "reasonable expectation of privacy" in their homes. United States v. Gori, 230 F.3d 44, 50 (2d Cir. 2000) (citing Oliver v. United States, 466 U.S. 170, 177 (1984) ("[T]he touchstone of [Fourth] Amendment analysis [is] the question whether a person has a constitutionally protected reasonable expectation of privacy." (internal quotation marks and citation omitted)).  A reasonable expectation of privacy does not extend to all places connected with a person's residence, however. For example, "a defendant has no legitimate expectation of privacy in 'a common area [that is] accessible to the other tenants in [a] multi-family apartment

building.'" United States v. Jones, 893 F.3d 66, 72 (2d Cir. 2018) (quoting United States v. Fields, 113 F.3d 313, 321 (2d Cir. 1997); see also United States v. Holland, 755 F.2d 253, 255 (2d Cir. 1985) ("[I]t is the established law of this Circuit that the common halls and lobbies of multitenant buildings are not within an individual tenant's zone of privacy. . . .").

Defendant bears the burden of demonstrating that he had a reasonable expectation of privacy. Perea, 986 F.2d at 633 ("In support of a motion to suppress evidence found in a warrantless search, the defendant must show that he had a reasonable expectation of privacy in the place or object searched. . . ."); United States v. Leon, No. 94 CR.308 (PKL), 1994 WL 557046, at *3 (S.D.N.Y. Oct. 7, 1994) ("it is defendant who bears the burden of proving the extent to which any of his Fourth Amendment rights have been violated") (citing Moore, 849 F.Supp at 210).

> Where the defendant's ability to invoke Fourth Amendment rights is in doubt, the Supreme Court has made clear that the defendant "bears the burden of proving . . . that he had a legitimate expectation of privacy in [the area intruded upon]." Rawlings v. Kentucky, 448 U.S. 98, 104 (1980). "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998) (citing Rakas, 439 U.S. at 143-44 & n. 12); see also Florida v. Riley, 488 U.S. 445, 455 (1989) (O'Connor, J., concurring). This Circuit has repeatedly recognized this burden allocation in cases in which the nature of the defendant's privacy expectations is not clear. See, e.g., United States v. Watson, 404 F.3d 163, 166 (2d Cir. 2005); Haqq, 278 F.3d at 47; United States v. Osorio, 949 F.2d 38, 40 (2d Cir. 1991); United States v. Pena Ontiveros, 547 F. Supp. 2d 323, 328-29 (S.D.N.Y. 2008); United States v. Granderson, 182 F.Supp.2d 315, 320-21 (W.D.N.Y. 2001).

United States v. Bedell, 311 F. App'x 461, 463 (2d Cir. 2009)

The Supreme Court has made clear that the reasonable expectation of privacy test is not the sole measure of the Fourth Amendment's protections. "[Al]though [that test] may add to the baseline" of Fourth Amendment protection, "it does not subtract anything from the

Amendment's protections 'when the Government . . . engage[s] in [a] physical intrusion of a constitutionally protected area.'" Florida v. Jardines, 569 U.S. 1, 5 (2013) (quoting United States v. Knotts, 460 U.S. 276, 286 (1983) (Brennan, J., concurring in the judgment)). "To establish a Fourth Amendment violation under this approach, there must be some trespass upon one of the protected properties enumerated by the Constitution's text," United States v. Sweeney, 821 F.3d 893, 899 (7th Cir. 2016), namely, "persons, houses, papers, and effects." U.S. Const. amend. IV; see also Allen, 813 F.3d at 80 ("The Amendment . . . 'indicates with some precision the places and things encompassed by its protections: persons, houses, papers, and effects.'" (quoting Jardines, 569 U.S. at 6)).

## B.    Analysis

While there is no dispute that the HSI agents had probable cause to arrest Rico, the parties disagree as to where Rico was when he was arrested. Rico argues that he "was standing wholly inside 2239 Bruckner Boulevard when he was grabbed by Zegarra, pulled out of the building, and forcibly arrested." (Def. Br. (Dkt. No. 43) at 11) According to Rico, this is "necessarily" the case, because the inner door for the ground floor entrance opens inward. (Id. at 10-11) The Government argues, however, that "the uncontroverted evidence at the Hearing showed that Rico was arrested in the threshold of the doorway and not inside his apartment, or even inside the common hallway." (Govt. Br. (Dkt. No. 46) at 15)

The record before this Court does not demonstrate that Rico was inside 2239 Bruckner Boulevard at the time of his arrest. Rico does not clearly state in his declaration, for example, that he was standing behind the open inner door. Defense counsel assumes as much, but the declaration does not contain this allegation. Instead, Rico says that "[a]n agent reached into where [he] was, grabbed [him] by [the] wrist and pulled [him] out of the building." (Rico

Decl. (Dkt. No. 23) ¶ 7) But this does not demonstrate that Rico was standing behind the inner door.

In contrast to the ambiguity in Rico's declaration, Agent Davila testified that Rico was standing "right in the middle of the doorway," and "was standing in the door threshold." (May 29, 2019 Tr. (Dkt. No. 40) at 36, 39) According to Davila, Rico "stepped into the threshold, approaching the . . . agents," who "were not inside the building." (Id. 103-04) Zegarra likewise testified that after Rico opened the inner door, "[h]e was standing in the threshold of the door. . . . [H]e was standing right below the threshold of the doorway, so that . . . he's about to come outside." (Id. at 157, 158-59)

Given this record, the Court concludes that Rico was standing in the door threshold at the moment that Agent Zegarra grabbed him and pulled him out into the driveway. Because Rico was standing in the door's threshold, he was not within his home, and thus had no conceivable expectation of privacy. In any event, this factual finding is of little consequence, because even if Rico had been standing a foot or two inside the door, he had no reasonable expectation of privacy in the hallway.

### 1. Whether Rico Had a Reasonable Expectation of Privacy in the Ground Floor Hallway

Although Rico argues that "he had exclusive control of [the hallway] and [that this area] was dedicated to his exclusive use" (Def. Br. (Dkt. No. 43) at 14), the record does not support these assertions. Indeed, Rico offered no evidence that he had "exclusive control" or "exclusive use" of the hallway. Rico's declaration describes an "external staircase that leads up to the entrance on the main floor to the apartment in which [his] landlords live," and "a second, ground floor entrance, which is the entrance [Rico] use[s] to enter the ground floor apartment." (Rico Decl. (Dkt. No. 23) ¶ 4) Rico's declaration does not assert, however, that his landlords

33

solely use the "main floor" entrance, or that he is the only resident who uses the ground floor

entrance. And given that his declaration states that the ground floor entrance "lead[s] to a

hallway" that in turn "leads to [both] the interior door of [his] studio apartment, and an internal

staircase that leads upstairs to where [his] landlords live" (see Rico Decl. (Dkt. No. 23) ¶ 5),

there is no reason to infer that Rico had exclusive control over, use of, or access to the hallway.

Rico does not assert that his landlords never use the internal staircase, and the presence of a

staircase "that leads . . . to where [his landlords] live" – absent evidence to the contrary –

suggests that the staircase is available for the landlords' use.[15] See United States v. Bartee, No.

13 CR. 365 RJS, 2013 WL 6164339, at *5 (S.D.N.Y. Nov. 12, 2013) ("In this case, Defendant

did not offer evidence at the hearing to suggest that he had a legitimate expectation of privacy in

the hallway outside of his apartment." (citing United States v. Bedell, 311 F. App'x 462-463 (2d

Cir. 2009) (affirming denial of motion to suppress evidence seized after officers "arrest[ed]

---

[15] The cases cited by Rico are not to the contrary. In United States v. Allen, 813 F.3d 76, 78 (2d Cir. 2016), the defendant lived on the second and third floors of a three-story building, but the front door to his apartment "was on the street level, and led directly to a hallway and staircase to the second floor." In contrast to the facts here, it was undisputed in Allen that "[n]either the entrance, the hallway, nor the staircase was shared by other tenants." Id. Here, there is no evidence that Rico had exclusive control over, use of, or access to the hallway in question. In any event, Allen does not address a tenant's reasonable expectation of privacy in a hallway. Instead, it addresses the constitutionality of "across the threshold" arrests where law enforcement officers have summoned suspects to the entrances of their homes. Id. at 82.

United States v. King, 227 F.3d 732, 749 (6th Cir. 2000) is also not on point. In King, the court addressed a tenant's reasonable expectation of privacy in the shared basement of a duplex apartment. The court emphasized that the defendant had "exhibited an actual subjective expectation of privacy in the basement by hiding . . . cocaine there." Id. at 744. Here, Rico has offered no evidence that he had a subjective expectation of privacy in the ground floor hallway. Moreover, in a later case, the Sixth Circuit distinguished between a tenant's reasonable expectation of privacy in the shared basement of a duplex apartment, and a tenant's reasonable expectation of privacy in a common hallway or stairwell. See United States v. Dillard, 438 F.3d 675, 683 (6th Cir. 2006) ("This case, however, is different from King because the common area at issue is not a basement but rather a hallway and stairway. Unlike a basement, a duplex common hallway and stairway are used by people other than tenants.").

34

Bedell without a warrant in the common hallway of . . . the rooming house in which he resided,"
where "Bedell provided scant evidence to support the inference that he had a reasonable
expectation of privacy in the . . . hallway. He did not endeavor to show circumstances regarding
his relationship with the other renters, their particular use of the common areas, or any other
factor that might conceivably form the basis of a conclusion that the officers' presence . . .
implicated Bedell's reasonable privacy expectations.")).

        Although Rico does not address in his declaration who has access to the hallway,
the evidence at the hearing shows that Rico did not have exclusive control over, use of, or access
to the hallway. Agent Davila and Agent Zegarra testified about a woman – one of Rico's
landlords – who opened a door at the top of the interior staircase and came out onto the stairwell.
She asked agents what was going on. Agent Zegarra told her to stay upstairs. (May 29, 2019 Tr.
(Dkt. No. 40) at 23, 42-43, 130; 161-62) Agent Davila also observed a man come "down [the
interior] stairs holding a pipe of marijuana." The man "walk[ed] out . . . of the premise[s] from
that stairwell out [of] the common hallway and le[ft]." (Id. at 44, 130)

        Rico emphasizes that the door at the ground floor entrance "was closed and
locked, excluding the public and law enforcement from entering." (Def. Br. (Dkt. No. 43) at 16)
But the Second Circuit "never ha[s] held that . . . common areas must be accessible to the public
at large . . . [to fall outside] an individual's protected zone of privacy." Holland, 755 F.2d at 256.
To the contrary, "common halls . . . are not within an individual tenant's zone of privacy even
though they are guarded by locked doors." (Id. at 255)

        The Court concludes that even if Rico had been arrested inside the ground floor
hallway of 2239 Bruckner Boulevard, his warrantless arrest would not have violated the Fourth

Amendment, because Rico did not have a reasonable expectation of privacy in the ground floor hallway.

## 2.     Whether the HSI Agents Unlawfully Trespassed on Rico's Property

Rico argues that – whether or not he had a reasonable expectation of privacy in the ground floor hallway – his warrantless arrest was unconstitutional because law enforcement "enter[ed] the curtilage of and breach[ed] the threshold of his home," and therefore "exceeded the license that custom affords to the public." (Def. Br. (Dkt. No. 43) at 16-17)  Rico contends that the "fenced-in yard and driveway" and area immediately in front of the ground-floor entrance to 2239 Bruckner Boulevard, as well as the hallway inside, constitute curtilage. (Id. at 19)  As explained below, this argument is not persuasive, because Rico has not offered evidence demonstrating that the agents "enter[ed] the curtilage of" his home or otherwise trespassed on his property.

"Curtilage" is "the area 'immediately surrounding and associated with the home,'" and is "'part of the home itself for Fourth Amendment purposes.'" Jardines, 569 U.S. at 6 (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)).  In determining whether an area constitutes curtilage, courts consider four factors: "'[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.'" United States v. Alexander, 888 F.3d 628, 632 (2d Cir. 2018) (quoting United States v. Dunn, 480 U.S. 294, 301 (1987)).  These factors do not amount to "a finely tuned formula that, when mechanically applied, yields a correct answer to all extent-of-curtilage questions," however. Dunn, 480 U.S. at 301 (internal quotation marks omitted).  Indeed, "the Dunn factors have never been the exclusive curtilage

considerations, and are relevant insofar as they help answer the 'central' question of whether the area in question 'harbors the intimate activity associated with the sanctity of a man's home and the privacies of life.'" Alexander, 888 F.3d at 632 (quoting Dunn, 480 U.S. at 300); see also Esmont v. City of New York, 371 F. Supp. 2d 202, 211 (E.D.N.Y. 2005) ("The extent of the homeowner's curtilage is determined by factors relevant to whether she reasonably expects the area to be treated as the home itself." (internal quotation marks and citation omitted)).

Rico's curtilage argument fails ab initio because of the same defect seen in his reasonable expectation of privacy argument: the lack of evidentiary support.

In the Fourth Amendment context, curtilage arguments fail where the area claimed to be curtilage "was a common area accessible to other tenants." United States v. Jones, 893 F.3d 66, 72 (2d Cir. 2018); see also Patrizio v. Nelson, No. 14CV7497 JBW VMS, 2016 WL 3582047, at *7 (E.D.N.Y. June 28, 2016) ("The factual determination of whether a vehicle is included within the scope of [a] particular premise[s]' curtilage may vary depending on, inter alia, whether the premises host a single-family or a multi-family dwelling.") (citing United States v. Skyes, 304 Fed. App'x. 10, 12n.1 (2d Cir. 2008)).

Here, Rico has offered no evidence of his use, or others' use, of the "fenced-in yard and driveway."[16] See Esmont, 371 F. Supp. 2d at 212 (denying that a yard constituted

---

[16] Although Rico argues in his brief that the fenced-in yard and driveway "[are] curtilage because [they are] directly adjacent to his home, fenced-in, and used only by residents for personal use" (Def. Br. (Dkt. No. 43) at 18-19), there is no evidence that these areas are "used only by the residents for personal use," much less evidence concerning Rico's use of these areas.

Moreover, the cases on which Rico relies (id. at 19-20) – such as United States v. Burston, 806 F.3d 1123, 1125-28 (8th Cir. 2015) – involve an evidentiary record not present here. In Burston, the Eighth Circuit found that the shared area under an exterior window of an eight-unit apartment complex in which the defendant resided was curtilage. In so holding, the court emphasized that the defendant had offered evidence showing that he "made personal use of the area" -- which was less than a foot from the defendant's apartment – "by setting up a cooking grill between the door

37

curtilage where, inter alia, "Esmont presents no evidence that she engaged in any intimate activities in the yard"); see also Seay v. United States, No. CR DKC 14-0614, 2018 WL 1583555, at *5 (D. Md. Apr. 2, 2018) ("Petitioner cannot show that the common hallway was part of the curtilage of the apartment he occupied. The area law enforcement officers entered did not belong to Petitioner. Petitioner had no right to control that area. He had no right to exclude people from the area. He had no right to improve that area. From all that appears, the hallway was used by other tenants. . . ."), appeal dismissed, 739 F. App'x 193 (4th Cir. 2018).

Because Rico has not shown that the agents trespassed on the curtilage of his home, his warrantless arrest did not violate the Fourth Amendment.[17]

---

and his window." Id. at 1127. The remaining cases cited by Rico are likewise distinguishable, because in those cases – unlike here – the Government did not contest that the areas in question constituted curtilage. See Regels v. Giardono, 113 F. Supp. 3d 574 (N.D.N.Y. 2015); United States v. Maxi, 886 F.3d 1318 (11th Cir. 2018); United States v. Lundin, 47 F. Supp. 3d 1003, 1013 (N.D. Cal. 2014), aff'd, 817 F.3d 1151 (9th Cir. 2016).

[17] As noted above, in addition to arguing that Rico has not demonstrated either a reasonable expectation of privacy or a property interest protected by the Fourth Amendment, the Government contends that the agents' warrantless arrest of Rico was justified by exigent circumstances.

"To determine whether exigent circumstances justif[y] . . . a warrantless entry . . . courts consider: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry." Cruz v. City of New York, 232 F. Supp. 3d 438, 454-55 (S.D.N.Y. 2017) (citing Loria v. Gorman, 306 F.3d 1271, 1284 (2d Cir. 2002)). "An additional factor commonly considered by courts is whether 'quick action is necessary to prevent the destruction of evidence.'" Arias v. United States, No. 05 CIV. 10497 (DAB), 2007 WL 4157152, at *11 (S.D.N.Y. Nov. 15, 2007) (quoting United States v. Brown, 52 F.3d 415, 421 (2d Cir.1995)).

As to the nature of the offense, "it is well-recognized that narcotics trafficking is a serious offense, most particularly in cases such as this that involve the well-planned transportation of a large quantity of contraband." United States v. Garcia, No. CR 88-529 (RR), 1989 WL 131205, at *4 (E.D.N.Y. Oct. 26, 1989) (citation omitted). As to the weapons factor, while the agents

## IV.    Whether Rico's Pre-*Miranda* Statements Should Be Suppressed

As explained above, the Court has found that – after Rico was taken into custody

and before he was given Miranda warnings – he made two sets of statements. After Agent

Davila identified himself and Agent Zegarra as federal agents, explained that they were

conducting a narcotics investigation, and told Rico that the agents knew that he had received

packages that contained narcotics, Rico told the agents that the packages were not his, but

instead belonged to his friend "Jimmy." This statement of Rico's was not made in response to

any question from the agents.

The Court has further concluded that Agent Zegarra then asked Rico whether

there were any drugs or weapons in the apartment, and that in response to that question, Rico

stated "that there could be something underneath the bed or in the couch, or in the closet, like in

a bookbag in the closet." (May 29, 2019 Tr. (Dkt. No. 40) at 165-67)

Rico argues that these statements "were made in response to custodial

interrogation or its functional equivalent and must be suppressed." (Def. Br. (Dkt. No. 43) at 25)

The Government contends that Agent Zegarra merely "employed a safety measure by asking

---

here had no specific evidence that Rico was armed, "firearms are . . . tools of the trade for
substantial narcotics dealers." Id. (internal quotation marks and citations omitted). Indeed,
Agent Davila testified that – on other occasions in which controlled deliveries had been
conducted – he and other agents had "found weapons, guns, knives" in the homes of those who
had received the packages. (May 29, 2019 Tr. (Dkt. No. 40) at 27) As to probable cause, there
is no dispute here that the agents had probable cause to believe that Rico was involved in
narcotics trafficking. As to presence on the premises, the agents knew that Rico was on the
premises. As to risk of escape or destruction of evidence, the Second Circuit has recognized that
"one of the legitimate purposes of controlled delivery is to identify and prosecute the person or
persons responsible for the movement of contraband." United States v. Gallo-Roman, 816 F.2d
76, 80 (2d Cir. 1987) (citing United States v. Singh, 811 F.3d 758 (2d Cir. 1987)) Moreover, it
would have been reasonable to infer that Rico might open the packages, discover the tracking
devices, and attempt to destroy the evidence, flee, or alert co-conspirators, such as Jimmy, to the
presence of law enforcement. While the last factor – the peaceful circumstances of the entry –
weighs against a finding of exigency, analysis of all the other factors demonstrates that the
Government's warrantless arrest of Rico was justified by exigent circumstances.

about dangerous items in the vicinity," and that his question does not amount to custodial interrogation. (Govt. Br. (Dkt. No. 46) at 22)

## A.  **Applicable Law**

"A suspect is entitled to <u>Miranda</u> warnings . . . if he or she is interrogated while in custody." <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 242 (2d Cir. 1998). "Custodial interrogation" takes place

> "when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak (the in custody requirement)[;] and (2) when the inquiry is conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought (the investigative intent requirement)."

<u>United States v. Rodriguez</u>, 356 F.3d 254, 258 (2d Cir. 2004) (quoting <u>United States v. Morales</u>, 834 F.2d 35, 38 (2d Cir. 1987) (internal citation omitted)); <u>see also</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under <u>Miranda</u> refers . . . to express questioning, [and] also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (footnote omitted)).

"<u>Miranda</u> instructs generally that an uncounseled statement made by a defendant during custodial interrogation should be suppressed. . . ." <u>United States v. Gaines</u>, 295 F.3d 293, 297 (2d Cir. 2002); <u>see also</u> <u>United States v. Mathurin</u>,148 F.3d 68, 69 (2d Cir. 1998) ("'[U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under <u>Miranda</u>.'" (quoting <u>Oregon v. Elstad</u>, 470 U.S. 298, 307 (1985)). This general rule is not absolute, however. The Supreme Court has "identified a 'narrow exception to the <u>Miranda</u> rule,' when arresting officers ask a defendant 'questions necessary to secure their own safety or the safety of the public.'" <u>United</u>

40

States v. Newton, 369 F.3d 659, 677 (2d Cir. 2004) (quoting New York v. Quarles, 467 U.S. 649, 658-59 (1984)); see also United States v. Reyes, 353 F.3d 148, 152 (2d Cir. 2003) ("Miranda warnings need not precede 'questions reasonably prompted by a concern for the public safety' or for the safety of the arresting officers." (quoting Quarles, 467 U.S. at 656, 658-59)). This exception "is a function of facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case." Id. at 152 (internal quotation marks and citation omitted).

While it is the general rule that a failure to advise a defendant of his Miranda rights results in suppression of his statements, "[a]n interrogating officer's failure to advise a suspect of his Miranda rights does not require suppression of the physical fruits of the suspect's unwarned statements." United States v. Capers, 627 F.3d 470, 493 (2d Cir. 2010) (citing United States v. Patane, 542 U.S. 630 (2004); United States v. Morales, 788 F.2d 883, 886 (2d Cir. 1986) ("Miranda . . . has not barred the use of unwarned, voluntary statements . . . to locate non-testimonial evidence. . . .").

**B.      Analysis**

Here, it is undisputed that Rico was "in custody" when he was seated on the couch in his apartment. Accordingly, the only remaining issues – as to Rico's pre-Miranda statements – are whether Rico made statements in response to interrogation, and whether the interrogation falls within the officer or public safety exception.

The Court concludes that Rico's initial statement to Agent Davila – in which he said that the packages were not his and that they belonged to "Jimmy" – was not made in response to "express questioning." Nor should Agent Davila have realized that his introductory remarks were "likely to elicit an incriminating response from [Rico]." Agent Davila was simply

41

explaining who he and Agent Zegarra were and why they were there. Rico has not argued that Agent Davila's introductory remarks were the functional equivalent of questioning, and any such argument would not be supported by the evidence. Accordingly, Rico's motion to suppress is denied as to the pre-Miranda statements he made after Agent Davila's introductory remarks.

As to Agent Zegarra's question about whether there were drugs or weapons in the apartment, this is clearly interrogation that Zegarra knew or should have known was "reasonably likely to elicit an incriminating response." Innis, 446 U.S. 291 at 301.

As to the Government's argument that suppression is unwarranted here because Agent Zegarra's statement falls within the officer or public safety exception, the Court is not persuaded. Agent Zegarra asked Rico whether there were drugs in the apartment. Such a question is not "reasonably prompted by a concern for the public safety or for the safety of the arresting officers." Reyes, 353 F.3d at 152 (internal quotation marks and citation omitted).

Courts generally apply the officer or public safety exception where officers are aware of specific facts suggesting a need to protect the police or the public from a threat of immediate harm. For example, in Quarles – where the Supreme Court articulated the exception – police found in a supermarket a man reported to have raped a woman at gunpoint. The police observed that the man had an empty gun holster, and asked him – before administering Miranda warnings – where his gun was. Quarles, 467 U.S. at 651-52. Consistent with Quarles, courts in this Circuit generally find the exception applicable where officers have specific information suggesting that the defendant has ready access to a weapon. See e.g., Newton, 369 F.3d at 664-65 (officers were told that defendant had threatened to kill his mother and kept a gun at their home); United States v. Ferguson, 702 F.3d 89, 94 (2d Cir. 2012) (officers learned from 911 call that defendant had fired shots during an altercation outside his apartment building, but found no

firearm when they arrested him outside the apartment building); see also United States v.

Estrada, 430 F.3d 606, 613-14 (2d Cir. 2005) (applying the exception where the defendant was a

drug trafficker, but noting that the officers knew that the defendant had prior assault convictions

and that a woman was in the defendant's apartment at the time of his arrest, and "emphasiz[ing]

that the exception will only apply where there are sufficient indicia supporting an objectively

reasonable need to protect the police or the public from immediate harm") (internal quotation

marks and citation omitted)). There were no facts here suggesting that the agents or the public

faced an immediate threat of harm. Indeed, the agents' willingness to uncuff Rico suggests the

opposite.

Accordingly, Rico's motion to suppress is granted as to the pre-Miranda

statements he made to Agent Zegarra in response to Agent Zegarra's question about drugs or

weapons in the apartment.[18]

---

[18] Rico has not argued that his post-Miranda statements should be suppressed based on the pre-Miranda statements he made to Agent Zegarra.

The legal effect of an incriminating statement taken in violation of Miranda on an incriminating statement taken post-Miranda is addressed in Oregon v. Elstad, 470 U.S. 298 (1985) and Missouri v. Seibert, 542 U.S. 600 (2004) (plurality opinion). "Elstad involved a situation in which a suspect made a [pre-Miranda] self-incriminating statement while two police officers were at his home investigating a robbery." Capers, 627 F.3d at 474. "The officers transported the suspect to a police station where they gave him a Miranda warning prior to obtaining both an oral and written confession." Id. "[When] the defendant moved to suppress the postwarning confessions . . . [t]he Supreme Court . . . held that '[t]hough Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.'" Id. (quoting Elstad, 470 U.S. at 309). Finding that "the police did not employ any coercive tactics to elicit either confession and that the defendant made his postwarning confession voluntarily . . . [t]he Court concluded that 'the dictates of Miranda and the goals of the Fifth Amendment proscription against use of compelled testimony [were] fully satisfied in the circumstances of th[e] case.'" Id. at 475-76 (quoting Elstad, 470 U.S. at 318).

"Whereas Elstad involved a good-faith effort by the police to administer a proper Miranda warning, Seibert addressed the use of a two-step interrogation strategy designed to elicit a post-

## V. RICO'S WAIVER OF HIS *MIRANDA* RIGHTS, AND HIS CONSENTS TO SEARCH HIS HOME AND ELECTRONIC DEVICES

Rico argues that he did not voluntarily waive his Miranda rights and "did not voluntarily consent to the searches of his home or mobile phone(s)." (Def. Br. (Dkt. No. 43) at 24) The Government counters that "the evidence at the [suppression] [h]earing showed that there was no coercion, and [that] Rico understood [and] . . . initial[ed]" the Miranda waiver; and argues that "no evidence was adduced at the [suppression] [h]earing to suggest that the signed consent forms were the product of anything other than voluntary, informed consent." (Govt. Br. (Dkt. No. 46) at 23, 24)

### A. Applicable Law

#### 1. *Miranda* Waiver

"The purpose of the Miranda warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to [an] interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." United States v. Carter, 489 F.3d 528, 534 (2d Cir. 2007). "Where a defendant 'has alleged police custodial interrogation in the absence of [a knowing, intelligent, and voluntary waiver], the burden shifts to the government to prove . . . [the defendant] was properly Mirandized and waived his rights.'" United States v.

---

Miranda waiver and confession after the defendant had already confessed before he was given Miranda warnings." Id. at 475. "In Seibert, the Supreme Court found unconstitutional 'a police protocol for custodial interrogation that call[ed] for giving no warnings of the rights to silence and counsel until interrogation ha[d] produced a confession.'" United States v. Williams, 681 F.3d 35, 40 (2d Cir. 2012) (quoting Seibert, 542 U.S. at 604). Under this protocol, "arresting officers were taught to intentionally omit Miranda warnings until their interrogation produced a confession, administer the warnings, and then question the defendant based on his pre-Miranda confession, in order to get him to restate it." Id. at 38.

Here, there is no evidence that the HSI agents executed "a two-step interrogation strategy designed to elicit a post-Miranda waiver and [incriminating statements] after the defendant had already [made such statements] before he was given Miranda warnings." Capers, 627 F.3d at 475.

Medina, 19 F. Supp. 3d 518, 537 (S.D.N.Y. 2014) (quoting United States v. Miller, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005))

"To prove a valid waiver [of Miranda rights], the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir.1995) (per curiam). "Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.'" United States v. Male Juvenile, 121 F.3d 34, 40 (2d Cir.1997) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

A waiver of Miranda rights is "knowing" if the "relinquishment of rights was . . . 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011) (quoting Moran, 475 U.S. at 421).

"Voluntariness is evaluated in light of 'the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials' to determine whether 'the defendant's will was overborne by [law enforcement's] conduct.'" Medina, 19 F. Supp. 3d at 538 (quoting United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991)). "Coercive police activity is 'a necessary predicate' to finding that a waiver of Miranda rights was not voluntary." Coronado v. Lefevre, 748 F. Supp. 131, 139 (S.D.N.Y. 1990) (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)).

## 2. Consent to Search

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to

consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). In assessing the validity of an

individual's consent, "courts examine the 'totality of all the circumstances' to determine whether

the consent was a product of that individual's free and unconstrained choice, rather than a mere

acquiescence in a show of authority." United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995)

(citations omitted); United States v. Isiofia, 370 F.3d 226, 231 (2d Cir. 2004) ("Voluntariness is a

question of fact determined by a 'totality of all the circumstances.'" (citations omitted)). The test

is an objective one, and the "ultimate question presented is whether 'the officer had a reasonable

basis for believing that there had been consent to the search.'" Garcia, 56 F.3d at 423 (quoting

United States v. Sanchez, 32 F.3d 1330, 1335-36 (8th Cir. 1994)). "The government has the

burden of proving, by a preponderance of the evidence, that a consent to search was voluntary."

Isiofia, 370 F.3d at 230 (citations omitted).

   In making a voluntariness determination, courts should consider the "age,

education, [and] intelligence [of the defendant], [the] length of detention, [the] use of physical

punishments or deprivations, and whether the alleged consenting person was advised of his

constitutional rights." United States v. Puglisi, 790 F.2d 240, 243 (2d Cir. 1986) (citing

Schneckloth, 412 U.S. at 226). Other relevant factors include "whether the defendant was in

custody and in handcuffs, whether there was a show of force, whether the agents told the

defendant that a search warrant would be obtained, whether the defendant had knowledge of the

right to refuse consent, and whether the defendant previously had refused to consent." United

States v. Lavan, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998) (footnotes omitted). Moreover, while

the test is ultimately one of objective reasonableness, the Court may "consider the 'particularities

of the situation that is presented in any given case' and the 'possibly vulnerable subjective state

of the person who consents,'" id. (quoting Schneckloth, 412 U.S. at 229), and should "pay

particular attention to coercive police questions," <u>United States v. Garcia</u>, 2001 WL 1297791, at *7 (S.D.N.Y. Oct. 25, 2001) (citing <u>Schneckloth</u>, 412 U.S. at 229).

###### B. **Analysis**

###### 1. *Miranda* **Waiver**

This Court understands Rico to contend that his waiver was not knowing and voluntary because he did not understand his rights (<u>see</u> Rico Decl. (Dkt. No. 23) ¶¶ 9, 12), and because he was "fear[ful]" and a "nervous ball" when he signed the <u>Miranda</u> waiver form. (Def. Br. (Dkt. No. 40) at 25)

As to whether Rico signed the <u>Miranda</u> waiver form knowingly – as discussed above – the Court credits the agents' testimony that the <u>Miranda</u> waiver form was read to Rico in Spanish, Rico's preferred language; that Rico had an opportunity to read the form, which was in Spanish; and that Rico told the agents that he understood the form. Moreover, Rico initialed each line on the <u>Miranda</u> form, further indicating that he had read and understood the form's contents. (<u>See</u> May 29, 2019 Tr. (Dkt. No. 40) at 48-49, 168-69) Given the agents' testimony and Rico's initials on the form, the Court concludes that Rico signed the <u>Miranda</u> form "with a full awareness of . . . the nature of the right being abandoned and the consequences of the decision to abandon it," <u>Plugh</u>, 648 F.3d at 127, and accordingly that his waiver was "knowing."

As to the voluntariness of Rico's waiver, the Court's factual findings again undercut Rico's argument. While Rico contends that he was afraid and nervous, the presence of such emotions does not compel a finding of involuntariness. <u>See</u> <u>United States v. Draconis</u>, No. 11 CR 1003 DAB, 2012 WL 1267838, at *2 (S.D.N.Y. Apr. 11, 2012) (concluding that a defendant "in the midst of a panic attack and suffering from chronic mental problems" did not evince "the kind of significant confusion or disorientation . . . that would warrant a finding that

47

her waiver was involuntary," and observing that courts in this Circuit "have found [valid waivers] in circumstances indicating far more physical pain and mental confusion"). In any event, Rico relies on his declaration – which asserts that he was "slammed . . . to the ground" and "dragged" into his apartment (Rico Decl. (Dkt. No. 28) ¶¶ 7-8) – to explain his claimed fear and nervousness. The Court has, however, rejected these allegations, and found that the agents used minimal and appropriate force to effect Rico's arrest, and that he walked back into his apartment under his own power.

Nor does the evidence reflect "conditions of interrogation" that suggest involuntariness. Rico was not subjected to any extensive interrogation before he signed the Miranda waiver form. Indeed, he signed the Miranda form within a few minutes of his arrest. (See May 29, 2019 Tr. (Dkt. No. 40) at 135) Moreover, Rico was in his own apartment and not handcuffed when he signed the form, and he was given adequate time to review and consider it. Finally, there is no evidence of "coercive police activity," which is the "necessary predicate" for deeming a waiver involuntary. Lefevre, 748 F. Supp. 131, 139 (internal quotation marks and citation omitted). The Court concludes that Rico's Miranda waiver was knowing and voluntary.

### 2. Consent to Search

There is little evidence in the record as to Rico's "age, education, [and] intelligence." See Puglisi, 790 F.2d at 243. According to Rico's declaration, he is a Nicaraguan citizen who entered the United States in 2015 on a "B1/B2 visa." Rico says that he "speak[s], read[s], and "understand[s] Spanish," but "can neither speak, nor read, nor understand English." (Rico Decl. (Dkt. No. 23) ¶ 3) The evidence at the hearing demonstrates that while Rico is more comfortable communicating in Spanish, he is capable of understanding questions in English questions and of responding in English. (See, e.g., May 29, 2019 Tr. (Dkt. No. 40) at 37, 40, 45,

108-09, 165-66) At the time of his arrest, Rico was working at a juice bar and performing with a mariachi band. (Rico Decl. (Dkt. No. 23) ¶ 6; May 29, 2019 Tr. (Dkt. No. 40) at 22, 62) The evidence before the Court does not suggest any intellectual limitations or inability to convey and understand information effectively. The evidence thus weighs in favor of finding that Rico's consent was voluntary. See Garcia, 2001 WL 1297791, at *8 (finding that consent was voluntary where defendant's wife was "an articulate, bilingual employed adult and the mother of two").

As to "[the] length of detention, [the] use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights," see Puglisi, 790 F.2d at 243, Rico had been in custody for only a few minutes at the time he signed the consent to search his apartment. (May 29, 2019 Tr. (Dkt. No. 40) at 134-35) Other than the force required to effect Rico's arrest – which this Court has found to be minimal – the record reveals no "physical punishments or deprivations." And Rico had been informed of his Miranda rights – in Spanish – before he signed the first consent to search form. Indeed, Rico initialed every such right in the Spanish-language Miranda form presented and read aloud to him. (Id. at 45-46, 48, 49-50, 169; see also GX 3) These factors also weigh in favor of finding that Rico's consent to search was voluntary.

As to the other relevant factors – "whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent," Lavan, 10 F. Supp. 2d at 384 – these factors split evenly. Although Rico was in custody when he signed the consent to search forms, he was not in handcuffs when he signed these forms. (May 29, 2019 Tr. (Dkt. No. 40) at 49) While both Agent Zegarra and Agent Davila were armed, their weapons were holstered

inside the apartment, when Rico signed the forms. (Id. at 45, 165) There is no evidence that the agents told Rico that a search warrant would be obtained, but there is likewise no evidence that he was informed that he had a right to refuse consent. Finally, Rico had not previously refused to consent. On the whole, these additional factors also weigh in favor of finding consent voluntary – though not quite as strongly. The same analysis and conclusions apply to Rico's execution of the second consent to search form.

In his brief, Rico suggests that his consent was involuntary because he was impermissibly coerced: according to Rico, he signed the forms after "he had been confronted by a phalanx of armed agents with guns aimed in his direction, pulled from his home while he was frozen with fear, forced to the ground, and handcuffed," and while he was a "nervous ball." (Def. Br. (Dkt. No. 40) at 24, 25) These circumstances are not indicative of impermissible coercion. "Courts have held that defendants voluntarily consented to searches in . . . situations that were considerably more coercive in nature." United States v. Zaleski, 559 F. Supp.2d 178, 187 (D. Conn. 2008) (citing, among other cases, United States v. Caballos, 812 F.2d 42, 51 (2d Cir. 1987) (consent to search not involuntary where a handcuffed defendant was questioned for "a couple of hours" at a Secret Service field office); United States v. Arango-Correa, 851 F.2d 54, 57 (2d Cir. 1988) (consent to search not involuntary where defendant was detained for five hours, strip-searched, and interrogated)); see also United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006) (third party's consent to search her apartment not involuntary where her "home was forcibly entered by a heavily armed SWAT team that initially secured her and her boyfriend in handcuffs and raised the possibility of taking the couple into custody while placing [the third party's] young daughter in protective care")).

This Court concludes that Rico's consent – as to all three forms – was knowing and voluntary.

## CONCLUSION

For the reasons stated above, Defendant Rico's motion to suppress evidence and statements obtained following his arrest is granted as to his pre-Miranda statements made in response to Agent Zegarra's question about drugs and weapons in Rico's apartment, but is otherwise denied. The Clerk of Court is directed to terminate the motion. (Mot. (Dkt. No. 20))

Dated: New York, New York
       August 26, 2019

SO ORDERED.

Paul L. Gardephe

Paul G. Gardephe
United States District Judge